FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2013 FEB -1 P 3:48

U.S. Bank National Association )
)
Plaintiff, ) Civil Action No. 1:13cv154
) TSE/IDD
v. )
)
First Mortgage Corp., )
)
Defendant. )
)

# COMPLAINT

For its complaint against Defendant First Mortgage Corp. ("First Mortgage"), Plaintiff U.S. Bank National Association ("U.S. Bank") states as follows:

## Introduction

1. This is a case for breach of contract and indemnification stemming from First Mortgage's refusal to repurchase certain mortgage loans from Freddie Mac. First Mortgage originated these loans and sold them to U.S. Bank who then sold them to Freddie Mac. This arrangement was governed by two contracts: a trilateral contract between all three entities and a bilateral contract between First Mortgage and U.S. Bank. In these contracts, First Mortgage guaranteed that the loans it was selling met Freddie Mac's guidelines and that if Freddie Mac ever determined that the loans didn't meet those guidelines, First Mortgage would repurchase the loans from Freddie Mac. Freddie Mac has determined that none of the loans at issue met its guidelines and demanded that First Mortgage repurchase them. But First Mortgage has refused to repurchase any of the loans and has therefore breached both contracts.

2. The two contracts contemplate one another. In the bilateral contract, First Mortgage promised to sell to U.S. Bank investment-grade mortgages that complied with Freddie

Mac's guidelines, to "repurchase" (i.e., buy back) any loans that Freddie Mac determined didn't comply with those guidelines (or First Mortgage's many other representations about the quality and accuracy of the loans), and to indemnify U.S. Bank for any losses or damages from any breaches of those representations. In the trilateral contract, U.S. Bank was to acquire these loans from First Mortgage and sell them to Freddie Mac. Again, First Mortgage guaranteed that all of these loans were originated in accordance with Freddie Mac's guidelines, and First Mortgage agreed that it would promptly repurchase any loan that Freddie Mac determined didn't meet its guidelines.

3. There are at least 13 loans at issue in this case. First Mortgage sold all of them under these contracts, and for every one of them, Freddie Mac determined that First Mortgage materially breached its sales representations and concluded that none of the loans met the appropriate guidelines. Freddie Mac notified First Mortgage of these breaches and requested that the loans be repurchased but First Mortgage refused to do so. As a result, Freddie Mac terminated First Mortgage as an approved lender for mortgage loan sales to Freddie Mac, and required U.S. Bank to pay Freddie Mac for all the losses from these loans. U.S. Bank is now indebted to Freddie Mac for at least $2,495,070 as a result of First Mortgage's blatant refusals and breaches.

4. U.S. Bank thus seeks judgment that First Mortgage breached the two contracts, that First Mortgage must repurchase the defective mortgages as it promised, or that First Mortgage must pay damages for the losses now imposed on U.S. Bank, and that First Mortgage indemnify U.S. Bank (under contract and common law) for all losses resulting from First Mortgage's breaches, including U.S. Bank's attorneys' fees.

## Parties

5. Plaintiff U.S. Bank is a national association organized under the laws of the United States. Its articles of association designate Ohio as the location of its main office for purposes of its banking charter. U.S. Bank's executive offices are in Minneapolis, Minnesota.

6. Defendant First Mortgage is a privately held corporation organized under the laws of California. First Mortgage's website lists its main corporate address as 1131 W. 6th Street, Ontario, California 91762. In the contracts at issue, First Mortgage lists its address as 3230 Fallow Field Drive, Diamond Bar, California 91765.

## Jurisdiction and Venue

7. This Court has subject-matter jurisdiction of this action under 28 U.S.C. § 1332. There is complete diversity among the parties, and the amount in controversy exceeds $75,000.

8. Venue is proper in this division under 28 U.S.C. § 1391. First Mortgage is subject to personal jurisdiction in this division, and a substantial part of the events giving rise to the claims occurred in this division because Freddie Mac (who plays a key role in the factual history of this case but is not a party) is located in this division. But more importantly, the parties agreed in the trilateral contract that "any claims, actions or proceedings brought by any party arising out of or related to this Agreement will be brought in the U.S.[] District Court for the Eastern District of Virginia, Alexandria Division." First Mortgage further "submit[ed] to the jurisdiction of [this] Federal District Court" and "consent[ed] to the dismissal of any action related to this Agreement that is brought in any other forum." (Ex. 1, ¶ 14(e).)

## Background

9. This section describes the industry relating to the sale of mortgage loans, some of the provisions and obligations of the contracts, and certain events that make up First Mortgage's several breaches and violations of the contracts. The complete language of the contracts can be

found in the attached Exhibits, incorporated by reference into this complaint. The trilateral contract is attached at Exhibit 1, and the bilateral contract is attached at Exhibit 2.

A.     **The Secondary-Mortgage Market and Repurchase Obligations**

10.    The parties in this action play different roles in the origination and financing of mortgage loans, a system that involves borrowers, brokers, lenders, investors, and servicers. Mortgage loans are mostly originated between borrowers and lenders or brokers face-to-face. An originated loan is then often sold, and then resold, "downstream" in what is called "the secondary market."

11.    Downstream investors don't normally have firsthand interaction with borrowers or origination-level knowledge about subject properties. These investors therefore rely on the lender's representations and warranties regarding the accuracy and completeness of origination-level information, the distribution or payment of loan proceeds, the collateral backing mortgage loans, and generally the quality of the mortgage loans and their suitability for purchase on the secondary market. Secondary purchasers thus generally require upstream sellers to adhere to certain guidelines, give covenants, and make warranties regarding the investors' prerequisites.

12.    Investors also frequently require loan sellers to accept the obligation to buy back, or "repurchase," defective loans and to indemnify certain downstream loan buyers for claims based on defective loans.

13.    For certain mortgage loans represented as of higher quality, government-sponsored entities like Freddie Mac or Fannie Mae buy the loans downstream. These entities are profit-driven but chartered by the federal government to expand the secondary market and ultimately to promote the growth of home ownership. These entities fund mortgages by issuing to investors securities backed by purchased mortgage loans, i.e., mortgage-backed securities. When they issue these securities, Fannie and Freddie guarantee investors a return. Fannie and Freddie thus require all purchased loans to comply with certain guidelines (for Freddie, its

Single-Family Seller/Servicer Guide). If a purchased mortgage loan is later determined by Freddie Mac to be in violation of these guidelines, the originator is frequently required to repurchase the loan. Freddie Mac will only purchase loans from certain approved lenders.

14. Though a loan might be sold to a purchaser and securitized downstream, the "servicing" of a loan may stay with the originator or the servicing rights may be sold to a different entity. The servicer is an entity that collects from the borrower periodic loan payments, and directs them to the current owner or investor who holds the mortgage loan. Different servicers may have different responsibilities and mechanisms for working with borrowers or purchasers.

**B.    The Bilateral Contract**

15. In this case, First Mortgage was the originator of a pool of mortgage loans that were purchased by Freddie Mac and serviced by U.S. Bank. The contractual relationship between First Mortgage and U.S. Bank was first established in the bilateral agreement attached as Exhibit 2 and dated September 19, 2005. That contract created an ongoing relationship between the two entities, where First Mortgage would sell and U.S. Bank would buy certain mortgage loans in reliance on several representations that First Mortgage made in the bilateral agreement, the guidelines of downstream investors (including Freddie Mac), and any later agreements over specific loan pools for specific investors (like the trilateral agreement with Freddie Mac, discussed below).

16. In that contract, for example, First Mortgage agreed that each "Mortgage Loan shall be subject" to its promises in the agreement, and be subject to "any separate written offering or commitment letters applying to the Mortgage Loans." (Ex. 2, pp. 1.)

17. First Mortgage represented and agreed that any sold loans would be "originated and closed according to" Freddie Mac's guidelines and regulations; First Mortgage represented and agreed that those guidelines and regulations would be "incorporated" into the contract itself,

5

and First Mortgage represented and agreed that it would "be responsible for ensuring the compliance of Mortgage Loans" under those guidelines and regulations. (*Id.* ¶ 1.)

18. First Mortgage also made at least 23 specific representations and warranties regarding the accuracy, quality, and completeness of the mortgage loans and the origination-level information associated with those mortgage loans to be sold. (*Id.* ¶ 5(a)-(w).) For example, First Mortgage agreed that "[e]ach Mortgage Loan is eligible for sale to the . . . Federal Home Loan Mortgage Corporation [Freddie Mac]" and that each "Mortgage Loan was properly closed in accordance with the requirements of the Correspondent Manual, and all applicable agencies rules and regulations." (*Id.* ¶ 5(k), (l).)

19. First Mortgage also agreed to repurchase any loan it sold to U.S. Bank if any of several listed events occurred, including, but not limited to:

    a. discovery of any false information in the loan documentation resulting from First Mortgage's negligence or "failure to exercise due diligence"

    b. discovery of any failure to obtain or maintain the required mortgage insurance policy on the loan

    c. discovery of any representation or warranty by First Mortgage associated with the loan found to be false "in the reasonable opinion of [U.S. Bank],"or "another investor"

    d. discovery of any material fraud, misrepresentation, or omission in the mortgage loan origination, including any misrepresentations by a broker or any other third party

    e. discovery of any other potential breach of any other warranty relating to the agreement.

(*Id.* ¶ 7.)

20. In addition, First Mortgage agreed that it would repurchase any loan if U.S. Bank was "required to repurchase any Loan sold by it to . . . FHLMC [Freddie Mac] . . . by reason of a deficiency in or omission with respect to the Mortgage Loan documents, instruments, and agreements, pertaining to any Mortgage Loan." (*Id.* ¶ 7(c).)

21. First Mortgage also agreed to a broad indemnity obligation relating to the bilateral contract and any future contract for loan sales pursuant to the bilateral agreement. Specifically, First Mortgage agreed, as just one example, to "protect, indemnify, and hold [U.S. Bank] harmless from and in respect to any and all losses, liabilities, reasonable costs, and expenses (including attorneys' fees) that may be incurred by [U.S. Bank] with respect to, or proximately resulting from any breach of, any representations, warranty, or covenant of [First Mortgage]." (*Id.* ¶ 8.)

22. That provision also provides that U.S. Bank "shall be entitled to rely upon [First Mortgage] as assembler and preparer of all Mortgage Loan documents, and is under no duty whatsoever to investigate or confirm any of the information set forth therein as to its honesty, accuracy, or completeness." (*Id.*)

C. **The Trilateral Contract**

23. As required in the bilateral contract, First Mortgage and U.S. Bank entered into the trilateral contract with Freddie Mac, in April 2008. Under that contract, First Mortgage made additional representations regarding the mortgage's eligibility for sale to Freddie Mac and agreed to sell those loans through U.S. Bank to Freddie Mac as called for in the bilateral agreement. Freddie Mac was to work directly with U.S. Bank as servicer and with First Mortgage directly in its role as originator.

24. In the contract, for example, First Mortgage agreed to first sell to U.S. Bank a minimum of $20 million in "Eligible Mortgages" originated by First Mortgage for cash. This performance was to be made "in accordance with the terms of the [bilateral] Agreement." (Ex. 1, ¶ 1.) U.S. Bank in turn was to sell those mortgages to Freddie Mac on the understanding that they were eligible for Freddie Mac's purchase. (*Id.* ¶ 2.)

25. The contract called on Freddie Mac to "'bifurcate' . . . the selling and servicing representations and warranties for operational purposes." Under this bifurcation, Freddie Mac

7

would (a) employ quality control and work directly with First Mortgage to obtain repurchases based on representations over mortgage quality and origination and (b) conduct servicing activities directly with U.S. Bank. (*Id.* ¶ 3.)

26. First Mortgage agreed that it would "remain responsible for all representations, covenants and warranties concerning the eligibility of the Eligible Mortgages for purchase by Freddie Mac." (*Id.* ¶ 3(i).) U.S. Bank would "not be responsible" for these representations unless First Mortgage was suspended or terminated by Freddie Mac. If that happened, Freddie Mac would then enforce those representations against U.S. Bank in its role as servicer. (*Id.* ¶ 3(ii).)

27. First Mortgage agreed that Freddie Mac had discretion to determine when mortgage loans sold under the contract "must be repurchased due to a breach" of representations relating to the loans' eligibility for purchase by Freddie Mac. Once First Mortgage was notified of such a determination, it was required to remit "repurchase funds" and "all penalties" to U.S. Bank as servicer, and U.S. Bank would then direct payments to Freddie Mac. (*Id.* ¶ 5.)

28. Among other termination provisions, First Mortgage agreed that Freddie Mac could "in its sole discretion" terminate the contract if "Freddie Mac disqualifies, suspends or terminates [First Mortgage's] status as a Seller/Servicer or otherwise takes adverse action against [First Mortgage] based upon any violation of the [Freddie Mac Seller/Servicer Guide] or any agreement with Freddie Mac." (*Id.* ¶ 11(b)(ii).) After that termination, Freddie Mac could enforce those repurchase rights against U.S. Bank. (*Id.* ¶ 3(ii).)

D. **Repurchase Requests**

29. On January 11, 2010, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—servicer number ###-###-8020, Freddie Mac number ###-##-0696[1]—must be repurchased. Freddie Mac found that

---

[1] Each mortgage loan is assigned a loan servicer number used by U.S. Bank and a Freddie Mac number used by Freddie Mac. Where possible this complaint references both numbers for

the appraisal analysis done for the property was inadequate, and that in fact a historical appraisal showed a lower value for the property, making the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before February 10, 2010. On February 20, 2010, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its decision on March 12, 2010. Following another appeal, Freddie Mac again affirmed its decision in a May 26, 2010 letter, noting that mortgage insurance had been rescinded on the loan, which constituted another ground for breach of Freddie Mac's guidelines. On May 31, 2012, Freddie Mac again demanded repurchase of the loan. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $261 thousand.

30. On February 25, 2010, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-1639, Freddie Mac number ###-##-4355—must be repurchased. Freddie Mac found undisclosed debt for the borrower and inadequate debt-to-income ratios, rendering the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before March 27, 2010. On April 17, 2010, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its determination on May 6, 2010. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $139 thousand.

31. On February 26, 2010, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-2096, Freddie Mac number ###-##-2293—must be repurchased. Freddie Mac found that there was an undisclosed mortgage for the borrower, that the property was not owner occupied as stated, and that the debt-to-income ratio was inadequate, rendering the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan

---

clarity. To protect the borrower's confidentiality, only the last four digits of each loan number referenced in this Complaint are shown.

9

before March 28, 2010. On April 20, 2010, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its determination on May 14, 2010. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $136 thousand.

32.     On May 26, 2010, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-7932, Freddie number ###-##-1484—must be repurchased. Freddie Mac found that the borrower falsely disclosed his position on the loan application. The issue rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before June 25, 2010. On June 12, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its determination on July 7, 2010. On July 15, 2010, First Mortgage again appealed the determination, and on August 12, 2010 Freddie Mac again affirmed its determination. On May 31, 2012, Freddie Mac supplements its repurchase demand by informing First Mortgage that the loan also did not comply with insurance requirements under Freddie Mac guidelines, and again demanded repurchased. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $291 thousand.

33.     On June 1, 2010, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-1927, Freddie number ###-##-4696—must be repurchased. Freddie Mac found that the borrower's income was falsely represented and that a review appraisal showed inaccurate information. These issues rendered the loan not eligible for sale to Freddie Mac. Freddie Mac determined that the loan was not eligible for sale to Freddie Mac. On April 24, 2010, First Mortgage appealed Freddie Mac's determination, and Freddie Mac affirmed its determination on June 1, 2010. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $239 thousand.

34.     On August 11, 2010, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number

###-###-9903, Freddie Mac number ###-##-4896—must be repurchased. Freddie Mac found that the loan lacked required documentation relating to the borrower's income, and a deficient borrower debt-to-income ratio. These issues rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before September 10, 2010. On October 9, 2010 First Mortgage sent a letter appealing the determination, and Freddie Mac affirmed its determination on November 1, 2010. On May 31, 2012, Freddie Mac supplemented its repurchase demand by informing First mortgage that the loan did not comply with Freddie Mac insurance guidelines, and again demanded repurchase. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $269 thousand.

35. On July 16, 2011, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-8561, Freddie Mac number ###-##-4083—must be repurchased. Freddie Mac found that the borrower's employment and income were misrepresented. These issues rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before August 15, 2010. On August 10, 2010, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its determination on August 25, 2010. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $198 thousand.

36. On July 19, 2011, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-7001, Freddie number ###-##-4049—must be repurchased. Freddie Mac found that the borrower did not disclose other debt and that Freddie Mac was unable to calculate the borrower's obligations and ratios. These issues rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before August 18, 2011. On August 18, 2011, First Mortgage sent a letter appealing Freddie Mac's determination, and

Freddie Mac affirmed its determination on August 31, 2011. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $148 thousand.

37. On December 19, 2011, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-3827, Freddie number ###-##-6728—must be repurchased. Freddie Mac found that the loan did not meet eligibility requirements for loans secured by manufactured homes, and that numerous required documents were missing from the loan file. These issues rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before January 18, 2012. On March 4, 2012, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its determination on March 28, 2012. On April 19, 2012, First Mortgage again appealed the decision, and Freddie Mac again affirmed its determination on May 9, 2012. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $111 thousand.

38. On February 9, 2012, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-1881, Freddie number ###-##-1404—must be repurchased. Freddie Mac discovered several flaws in the origination of the mortgage, including that the loan was designated a refinance when it was not a refinance, and the borrower's income and financial obligations were misrepresented. These issues rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before March 10, 2012. On April 10, 2012, First Mortgage appealed Freddie Mac's determination, and Freddie Mac affirmed its determination on April 12, 2012. First Mortgage has not repurchased the mortgage. The total amount owed for this loan is over $121 thousand.

39. On March 20, 2012, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-2986, Freddie number ###-##-1689—must be repurchased. Freddie Mac explained that

it found the co-borrower's employment status was falsely represented, that appropriate self-employment income documentation was not provided, and that the borrower's qualifying ratios could not be determined. Several required documents were missing from the mortgage loan file. These issues should have rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before April 9, 2012. On April 10, 2012, First Mortgage sent a letter appealing Freddie Mac's determination, and Freddie Mac affirmed its determination on May 8, 2012. First Mortgage has not repurchased the loan. The total amount owed for this loan is over $280 thousand.

40. On July 10, 2012, Freddie Mac informed U.S. Bank that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-7679, Freddie number ###-##-1438—must be repurchased. Freddie Mac found that the required insurance for the loan was rescinded, rendering the loan not eligible for sale to Freddie Mac. The total amount owed for this loan is over $187 thousand.

41. On August 23, 2012, Freddie Mac informed First Mortgage that Freddie Mac had determined that one of the mortgages sold under the trilateral contract—loan servicer number ###-###-7277, Freddie number ###-##-2052—must be repurchased. Freddie Mac stated that documentation from the Mortgage Guarantee Insurance Corporation stated that, as a result of a quality-control audit, the pool insurance for the loan was rescinded. This issue rendered the loan not eligible for sale to Freddie Mac. Freddie Mac requested that First Mortgage repurchase the loan before September 22, 2012, but First Mortgage refused to do so. The total amount owed for this loan is over $119 thousand.

E. **Suspension and Termination of First Mortgage as a Freddie Mac Seller**

42. Freddie Mac holds discretion under the contracts and its incorporated guidelines to disqualify or suspend a lender from eligibility to sell mortgages to Freddie Mac. Failure to

repurchase a mortgage upon a determination of a breach of Freddie Mac guidelines is a stated reason for termination in the Freddie Mac guidelines.

43. After Freddie Mac determined that seven of the above-referenced mortgage loans were requested for repurchase and after First Mortgage refused to repurchase the loans, on March 8, 2011 Freddie Mac informed First Mortgage that its eligibility as a seller of mortgages to Freddie Mac and its eligibility to acquire servicing rights for Freddie Mac mortgages were suspended. First Mortgage did not appeal the suspension.

44. In October 2011, First Mortgage attempted to tender a portion of funds for four of the outstanding repurchases discussed above directly to Freddie Mac, which Freddie Mac did not accept because (aside from being inadequate to satisfy the requirements for those four loans) the funds were supposed to be directed to U.S. Bank, who would then direct those funds to Freddie Mac by the terms of the trilateral contract. Though First Mortgage acknowledged that it must direct repurchase funds to U.S. Bank, it never submitted any repurchase funds to U.S. Bank.

45. After First Mortgage still had not repurchased the loans discussed above, on September 18, 2012 Freddie Mac terminated First Mortgage as an approved lender. On October 3, 2012, First Mortgage appealed Freddie Mac's determination to terminate First Mortgage as an approved lender, arguing that it had no obligation to honor Freddie Mac's repurchase demand. On November 27, 2012, Freddie Mac denied Freddie Mac's appeal to terminate its status as an approved lender.

46. Despite Freddie Mac's termination of First Mortgage as an approved seller, First Mortgage represented itself on its website as being an approved lender for Freddie Mac.

F.   **Refusals to Repurchase with U.S. Bank**

47. U.S. Bank assumed responsibility for the repurchase obligations for the mortgage loans discussed above that First Mortgage refused to repurchase.

48. Since termination, Freddie Mac made repurchase demands for the above thirteen mortgages on U.S. Bank under the terms of the Agreement.

49. Since U.S. Bank has incurred liability to pay Freddie Mac for all of the above mortgage loans determined by Freddie Mac to be deficient and in breach of First Mortgage's sales representations under the trilateral agreement, U.S. Bank notified First Mortgage of its obligation to repurchase or otherwise make whole U.S. Bank for the resulting losses from First Mortgage's breaches of the bilateral and trilateral contracts:

- For Loan Servicer No. ###-###-8020, Freddie No. ###-##-0696, U.S. Bank issued a makewhole statement in November 2012 seeking $251,041.91 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-1639, Freddie No. ###-##-4355, U.S. Bank issued a makewhole statement in November 2012 seeking $139,229.95 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-2096, Freddie No. ###-##-2293, U.S. bank issued a makewhole statement in November 2012 seeking $136.786.19 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-7932, Freddie No. ###-##-1484, U.S. Bank issued a makewhole statement in November 2012 seeking $291,582 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-1927, Freddie No. ###-##-4696, U.S. Bank issued a repurchase statement on November 7, 2012 for $239,678.42 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-9903, Freddie No. ###-##-4896, U.S. Bank issued a makewhole statement in November 2012 for $269,779.15 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-8561, Freddie No. ###-##-4083, U.S. bank issued a repurchase statement on November 5, 2012 for $198,524.41 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-7001, Freddie No. ###-##-4049 U.S. Bank issued a repurchase statement on November 5, 2012 for $148,348.99 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-3827, Freddie No. ###-##-6728, U.S. Bank issued a repurchase statement on November 7, 2012 for $111,338.85 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-1881, Freddie No. ###-##-1404, U.S. Bank issued a repurchase statement on November 7, 2012 for $121,217.12 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-2986, Freddie No. ###-##-1689, U.S. Bank issued a repurchase statement on November 7, 2012 for $280.593.43 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-7679, Freddie No. ###-##-1438, U.S. Bank issued a makewhole statement in November 2012 for $187,895.42 in accumulated repurchase costs and fees;

- For Loan Servicer No. ###-###-7277, Freddie No. ###-##-2052, U.S. Bank issued a makewhole statement in November 2012 for $119,060.36 in accumulated repurchase costs and fees.

50. In all, U.S. Bank has incurred losses in obligated payments to Freddie Mac of at least $2,495,070 due to the breaches in First Mortgage's sales representations and First Mortgage's failure to repurchase or make U.S. Bank whole for loans determined by Freddie Mac to have not been eligible for sale to Freddie Mac.

## Count I
## Breach of Bilateral Contract

51. U.S. Bank alleges by reference paragraphs 1 through 50.

52. U.S. Bank and First Mortgage at all relevant times have been parties to the above referenced September 2005 bilateral contract.

53. The bilateral contract is legally enforceable and required First Mortgage to (a) sell mortgages eligible for sale to Freddie Mac, (b) sell mortgages originated in accordance with First Mortgage's representations and warranties regarding the quality, accuracy, and completeness of the loans and loan documents, (c) repurchase any loans that failed to meet the conditions described above, including loans where U.S. Bank paid funds to an investor on account of a breach, and (d) indemnify or make U.S. Bank whole for any losses or injury or damages, including attorneys' fees, incurred as a result of any failure by First Mortgage to comply with the bilateral or trilateral agreements and the conditions described above.

16

54. U.S. Bank has complied with the bilateral contract.

55. First Mortgage breached the bilateral contract by selling U.S. Bank the thirteen loans described above, which were determined by Freddie Mac to not be in compliance with its guidelines as represented and were otherwise contrary to First Mortgage's representations regarding the quality, accuracy, and completeness of the mortgage loans and loan documents.

56. First Mortgage also breached the bilateral contract by failing to repurchase the thirteen loans from U.S. Bank as promised under the contract, and failing to otherwise make U.S. Bank whole as promised under the contract.

57. First Mortgage's breaches have caused U.S. Bank to have to pay Freddie Mac at least $2,495,070, have caused U.S. Bank to incur substantial attorneys' fees and other costs following First Mortgage's termination and assignment of these mortgage loans to U.S. Bank, and deprived U.S. Bank of the benefit of its bargain.

58. U.S. Bank seeks specific performance of First Mortgage's obligation to repurchase or otherwise make whole U.S. Bank for its losses arising from the above-described breaches, or alternatively seeks money damages for First Mortgage's breaches.

## Count II
## Breach of Trilateral Contract

59. U.S. Bank alleges by reference paragraphs 1 through 50.

60. U.S. Bank and First Mortgage at all relevant times have been parties to the above-referenced April 2008 trilateral agreement (also signed by Freddie Mac). The trilateral contract is legally enforceable and required First Mortgage to sell mortgage loans to U.S. Bank subject to certain terms and conditions, and to repurchase those loans if, among other reasons, Freddie Mac determined they were not eligible for sale to Freddie Mac.

61. U.S. Bank has complied with the trilateral contract.

62. First Mortgage breached the trilateral contract by selling U.S. Bank the thirteen loans referenced above, which were determined by Freddie Mac to not be in compliance with its guidelines as represented and were otherwise contrary to First Mortgage's representations regarding the quality, accuracy, and completeness of the mortgage loans and loan documents.

63. First Mortgage also breached the trilateral contract by failing to repurchase the subject loans from Freddie Mac as promised under the contract, failing to repurchase the subject loans from U.S. Bank as promised, and failing to otherwise make U.S. Bank whole.

64. First Mortgage's breaches have caused U.S. Bank to have to pay Freddie Mac at least $2,495,070, have caused U.S. Bank to incur substantial attorneys' fees and other costs following First Mortgage's termination and assignment of these mortgage loans to U.S. Bank, and deprived U.S. Bank of the benefit of its bargain.

65. U.S. Bank seeks specific performance of First Mortgage's obligation to repurchase or otherwise make whole U.S. Bank for its losses arising from the above-described breaches, or alternatively seeks money damages for First Mortgage's breaches.

## Count III
### Indemnification

66. U.S. Bank alleges by reference paragraphs 1 through 50.

67. First Mortgage's duty to indemnify is by express contractual agreement. In paragraph 8 of the bilateral contract, and as described above in paragraph 21, First Mortgage agreed to indemnify, make whole, or hold U.S. Bank harmless from any claim, loss, or other damage as a result of First Mortgage's failure to abide by the terms of the bilateral or trilateral contracts.

68. U.S. Bank has been forced to repurchase the above-referenced thirteen loans because of wrongful acts or omissions and defects in the loans for which First Mortgage, not

U.S. Bank, was responsible, and for which First Mortgage specifically agreed to indemnify or make U.S. Bank whole.

69. U.S. Bank is entitled to indemnification in this case from First Mortgage under the terms of the bilateral and trilateral contracts as well as under the common law.

70. U.S. Bank has made a demand for indemnification in regard to losses or claims that it has incurred and continues to incur, and First Mortgage has refused to indemnify U.S. Bank or make U.S. Bank whole for losses or claims that U.S. Bank has incurred or will incur due to the wrongful acts or omissions by First Mortgage.

71. U.S. Bank is entitled to all attorneys' fees incurred from the breaches described above by the terms of paragraph 8 of the bilateral contract.

72. U.S. Bank has suffered damages caused by First Mortgage's acts and refusals at least in the amount of $2,495,070, and for which U.S. Bank is entitled to indemnification by First Mortgage.

## Relief Demand

73. WHEREFORE, based on the facts alleged above, Plaintiff U.S. Bank seeks judgment in its favor as follows:

    a. for specific performance of the bilateral and trilateral contracts;

    b. for damages in the amount of at least $2,495,070, or in an amount to be proven at trial;

    c. for an award of costs, disbursements, interest, and attorneys' fees as provided under the bilateral agreement, or as otherwise allowed by law; and

    d. for any other relief as the Court deems equitable or just.

Dated: February 1, 2013        Respectfully submitted,

*[signature]*

R. Scott Caulkins, VSB No. 23584
CAULKINS & BRUCE, PC
2300 Wilson Boulevard
Suite 240
Arlington, VA 22201
Tel: 703-558-3664
Fax: 703-525-1331
Email: scaulkins@caulkinsbruce.com

Of Counsel (*pro hac vice* admission to be filed):

Michael Collyard, MN Bar No. 302569
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Tel: (612) 349-8500
Fax: (612) 339-4181
Email: macollyard@rkmc.com

*Counsel for Plaintiff U.S. Bank*